# JULIUS HOPPE v. CITY OF WINONA and Another.[1]

January 20, 1911.

Nos. 16,832—(192).

**Death from electric discharge — liability of city.**

The city of Winona, under authority of congress and of the legislatures of Wisconsin and Minnesota, constructed a bridge across the Mississippi river, from the Minnesota to the Wisconsin side thereof, and thereafter operated it as a toll bridge. By an ordinance duly enacted the city authorized defendant power company to string its electric wires over and attach the same to the framework of the bridge for the transmission of electricity from its plant in Wisconsin to and the distribution thereof in the city of Winona. The city reserved the right to control the manner in which the wires were so strung, and directions in that respect were given by the ordinance. The wires so placed upon the bridge carry from twenty-five thousand to forty-five thousand voltage of electricity, and at times throw off a "brush" or "disruptive discharge" sufficient to cause the death of a person in close proximity therewith, without actual contact with the wire. The city thereafter let a contract for painting the bridge, and decedent was in the employ of the contractor in doing the work. He was killed while so at work by a "brush" or "disruptive discharge" of electricity from the wires. It is *held*:

1. That if the wires were negligently strung upon the bridge, by reason of the fact that they were uninsulated, and not sufficiently elevated upon supports above the structure, to avoid persons coming in contact therewith while at work upon the bridge, both the city and the power company are liable.

2. Whether there was negligence in this respect was, on the evidence, a question of fact, and the verdict of the jury is sustained.

3. That the relation of the city to the bridge was that of private owner of a quasi public highway, and its grant of authority to the power company to string its wires thereon was an exercise of its municipal and not of its governmental functions.

4. The dangers from a "brush discharge" of electricity from the wire were unknown to the contractor or decedent, and both were entitled to warning thereof from the city.

5. The doctrine of independent contractor has no application to the case.

[1]Reported in 129 N. W. 577.

6. The question of decedent's contributory negligence was a question of fact for the jury.

Action in the district court for Winona county by the administrator of the estate of Ernest Lampe against the city of Winona and the La Crosse Water Power Company to recover $5,000 for the death of his intestate. The facts are stated in the opinion.

The complaint alleged, among other things, that the wires were capable of conveying a very powerful current of electricity, were not insulated, were negligently attached to short steel towers or brackets fastened to the top of the bridge, and were so carelessly and negligently strung that at one point they passed within three or four feet of the top cross girder, and one wire within eighteen or twenty inches of the inside edge of one beam on the top of the bridge; that the wires so strung were negligently maintained on and along the top of the bridge and were negligently permitted by the defendant city to be so maintained, and on the day of the accident the defendant power company negligently permitted the wires to be charged with a heavy current of electricity, and the defendant city negligently permitted the wires to be so charged; that while decedent was astride of the beam nearly opposite the point where the wires sagged and hung over the top cross girder of the bridge, and when in the act of straightening his body, suddenly and without warning a current of electricity from the wires passed through his body, enveloping it in flames and smoke, and causing his body to fall into the river; that at the time of the accident the wires were charged with a heavy current of electricity exceeding forty thousand voltage. The separate answer of defendant city alleged that the work of painting the bridge was done under contract and defendant did not exercise any control or authority over the contractor or his servants. The separate answer of defendant power company, except for the formal admissions, was a general denial.

The case was tried before Snow, J., and a jury which returned a verdict in favor of plaintiff for the sum demanded. From the order denying defendants' separate motions for judgment notwithstanding the verdict or for a new trial, they appealed separately. Affirmed as to both defendants.

*Webber & Lees,* for appellant La Crosse Water Power Company.
*R. A. Randall* and *Brown, Abbott & Somsen,* for appellant city.
*Buck & Fitzpatrick,* for respondent.

BROWN, J.

By an act of congress approved September 25, 1890 (26 St. 470), an act of the legislature of the state of Wisconsin (Laws Wis. 1880, p. 314, c. 274), and Sp. Laws Minn. 1891, p. 742, c. 113, the city of Winona ·was authorized to construct and maintain a wagon bridge across the Mississippi river from the city to the Wisconsin side of the stream. Pursuant to this authority the bridge was constructed and since maintained by the city. Defendant La Crosse Water Power Company owns and operates a power plant on the Wisconsin side of the river, developing therefrom electricity and conveying the same by means of electric wires to the city of Winona. In 1907 the city council, by ordinance duly enacted, granted authority to and permitted the power company to string its said wires over and attach the same to the bridge. The ordinance required that the wires should be attached to high voltage insulators, and be strung from the frames of angle iron to be attached to the topmost girders of the bridge. The wires were so strung about fifty feet above the traveled portion of the bridge and in no way interfered· with the use of the same. They were of copper, three-eighths of an inch in diameter, and not insulated. At one point upon the Wisconsin side of the channel of the river the wires were so strung that by reason of the long distance between the supports they sagged and came within three feet of a crossbar of the bridge, and extending parallel with the same a distance of fifteen inches of the top girder, so that it was three feet above and fifteen inches from the side of the girder.

It became necessary in 1909 to make certain repairs upon the bridge, and a contract was let by the city to one Hoppe to paint the iron work of the entire structure. Hoppe employed plaintiff's intestate, who, while upon the iron girder at the top of the bridge, and at the point where the electric wires sagged to within three feet of the same, received a "brush" or "disruptive discharge" of elec-

tricity therefrom, without coming in actual contact therewith, and was killed. Plaintiff thereafter brought this action, charging the power company with negligently placing the wire upon the bridge, uninsulated, and not at a sufficient height from the top thereof to avoid injury to workmen upon the bridge, the city with permitting the same, and defendant city with a failure to warn and instruct decedent of the dangers incident to a "brush discharge" of electricity. Defendants put in issue the negligence charged, and alleged that decedent came to his death by reason of his own contributory negligence. Plaintiff had a verdict, and defendants separately appealed from an order denying their independent motions for judgment notwithstanding the verdict or a new trial. The assignments of error present questions peculiar to each defendant. We dispose of the question presented by the power company first.

1. It appears that the wires were strung upon the bridge pursuant to authority granted by the city in the form of an ordinance enacted for that purpose, which ordinance specified the manner and condition in which they should be strung. In fact, the ordinance required that the work be done under supervision of the city engineer. The trial court instructed the jury that, if there was negligence in the manner in which the wires were attached to the bridge, directing particular attention to the place where decedent met his death, both defendants were liable. It is the contention of the power company that the evidence wholly fails to make a case of negligence in this respect, and, therefore, that a verdict should have been directed for both defendants. In this we do not concur. The question was, on the evidence, one of fact for the jury.

There is and can be no controversy concerning the principles of law applicable to the case.

The power company was unquestionably under legal obligations, in placing the wires upon the bridge, to exercise care commensurate with the dangerous character of the instrumentality, and to adopt such methods as were reasonably practicable to avoid endangering those who might be employed upon or otherwise making legitimate use of the structure as a thoroughfare. Gilbert v. Duluth General Ele. Co., 93 Minn. 99, 100 N. W. 653, 106 Am. St. 430; Musolf v.

Duluth Edison Ele. Co., 108 Minn. 369, 122 N. W. 499, 24 L.R.A. (N.S.) 451. The wires in question carried from twenty-five thousand to forty-five thousand voltage of electricity, and were not insulated or otherwise protected from contact by persons working upon the bridge. It appears that uninsulated wires so heavily charged throw off at times a "brush" or "disruptive discharge" of electricity sufficient to cause the death of a person in close proximity thereto, without actual contact with the wire. This fact is well known to electricians and those familiar with this generally unknown, powerful, and destructive agency.

The power company was bound to take knowledge of the fact that it would become necessary from time to time to make repairs upon the bridge, particularly in painting the same, to prevent deterioration and decay from exposure to the elements, and in placing the wires thereon precaution should have been taken for the safety of those thus engaged. Byerly v. Consolidated Co., 130 Mo. App. 593, 109 S. W. 1065. If the placing of the wires upon the bridge in the manner stated was an act of negligence, and likely to result in injury in some form, it is immaterial that defendant could not reasonably have anticipated injury in the manner disclosed in the case at bar. Christianson v. Chicago, St. P. M. & O. Ry. Co., 67 Minn. 94, 69 N. W. 640. But, as stated, the law of the case is not disputed. Defendant's contention is that its full duty in the premises has been discharged.

It is claimed that the evidence is conclusive that it was impracticable to insulate the wires; that, if insulated, the elements would destroy the same and render the wires of greater danger; and, further, that they could not have been elevated higher at the point in question without imposing an additional strain upon the bridge and imperiling its strength; hence that the court should have directed a verdict in defendants' favor. This argument is not of substantial force.

It must be conceded, since the jury so found, that in the condition in which the wires were strung they were dangerous to the life and safety of those at work upon the bridge. There was no imperative necessity that they should be strung at this place, and the reason

for doing so would seem to have been one of economy in the distribution of electricity developed by defendant at its plant. Defendant had no vested right in the use of the bridge for that purpose, and, though granted by the city council, the right should have been exercised with due regard to the safety of those engaged in the vicinity of the wires, and, if their safety could not be provided for, a probable injury guarded against by reasonable precautions, the right should not have been exercised at all, and other methods of transmitting the electricity to Winona adopted and resorted to.

Defendants offered considerable evidence tending to show that the manner of stringing the wires over the bridge involved a consideration of many technical facts and conditions, cognizable only by experts, and of which laymen could not intelligently judge, from which it is urged that the opinion of the experts that the wires were properly placed is conclusive. This contention is not sound. The experts, in giving their testimony to the effect that the wires were strung in the only practicable manner, had in mind, not the protection of third persons from possible injury, but the safety of the bridge, and the fact that additional supports would increase the strain upon that structure, and therefore were impracticable. For reasons already suggested, this furnishes no sufficient excuse. If the bridge was of insufficient strength to support the wires with proper supports, it should not have been adopted as a means of reaching Winona with the wires.

2. The assignments of error challenging rulings of the court in the admission and exclusion of evidence, and in its charge to the jury, require no extended discussion. We have examined them all, and discover no reversible error. The complaint alleged that wires in the condition of those in question would throw off a "brush discharge" of electricity. This was supported by evidence at the trial in connection with other evidence of a "disruptive discharge," and complaint is made because the court permitted the jury to determine whether decedent's death was caused by either. In this there was no prejudicial error. It would seem of no particular importance by what name the escaping electricity was known. Defendant was informed by the complaint of the fact that a discharge of electricity

113 M.—17.

from the wire caused decedent's death, and this was sufficient to admit of the evidence characterizing it either as a brush or disruptive discharge. The complaint also alleged that the wires were not insulated, and, as remarked by the trial court, the allegations thereof, fairly construed, charged negligence in stringing them over the bridge in that condition.

There were no errors in the instructions of the court to the jury. The charge was full and complete, and gave to the jury the correct rules of law applicable to the case. The points made support in the main the contention that issues not presented by a strict construction of the complaint were submitted to the jury. The complaint was entitled to a liberal construction, and there was no such departure therefrom as to justify a reversal.

The question whether decedent was entitled to instructions concerning the dangers incident to a brush or other discharge of electricity was properly submitted to the jury, as well as the question of his contributory negligence. No evidence was presented that decedent was familiar with the action of electricity under conditions like those here disclosed, and in view of the fact that his work took him near the wires he was entitled to proper warning of the dangers incurred. The evidence made the question whether decedent was at the particular point upon the bridge contrary to instructions, and whether he was in the exercise of due care for his safety while there, questions of fact for the jury, and we discover no reason for disturbing their conclusion.

. The appeal by the city presents questions respecting its liability which do not involve the power company. These questions will be disposed of in the order presented in the brief of counsel for the city.

The bridge was constructed across the river under authority granted to the city by the federal congress and the legislatures of the states of Wisconsin and Minnesota. Both legislative acts provided that the bridge, when so constructed, might, at the election of the city council, be operated and maintained without cost to the traveling public, or as a toll bridge. The Wisconsin act prescribed a maximum charge, if the city council determined to operate it for hire. No question is made respecting the authority of the city to

construct and maintain the bridge, and no controversy arises as to its ownership of the structure, and its power and duty to keep and maintain it in suitable repair for the uses intended by its construction. Nor is it questioned that authority was granted the power company by the city council to string its electric wires over and attach the same to the frame work of the bridge. The city council determined to operate the structure as a toll bridge, and it has exacted a charge from persons making use thereof. It is also undisputed that the city entered into a contract with one Hoppe for painting the bridge, and that decedent was in the employ of the contractor, and engaged in the performance of this contract, at the time of his death. The contentions of the city are that:

(1) In passing the ordinance in question, and thereby permitting the wires to be strung and maintained upon the bridge, the city was (if not acting wholly ultra vires, so as to be in any way liable) in the exercise of a public or political, and not a private or corporate, function, and as a legislative body, in a semijudicial capacity, and in a matter involving governmental policy and discretion.

(2) That Hoppe, the employer of deceased, was the city's independent contractor, and the rule of respondeat superior had no application as between the city and the contractor's servants; and

(3) That, if the city owed the contractor's servants any duty respecting notice and warning of dangers from coming in proximity with the wires, that duty was fully discharged.

1. The determination of the first question depends largely upon the relation of the city to the bridge and its maintenance. If the construction and control thereof was an exercise of its governmental powers, as distinguished from its municipal or proprietary affairs, then it is quite probable that its management, including the act granting permission to string the wires thereon, would also be governmental or legislative, for an exercise of which no action lies. But, if its relation to the bridge involves its business or proprietary capacity, the ordinance granting the privilege to the power company would partake of the same character.

It is clear that the bridge was the private property of the city, and held, owned, and maintained in its proprietary capacity. It

was not constructed with reference to a street or highway laid out or established by public authority, and was not open to the free and unrestricted use of the public. Travel thereon was limited to those who paid the prescribed toll, receipts from which went into the city treasury. The city was under legal obligations to keep and maintain the bridge in suitable repair for the use of those paying for the privilege, precisely as municipalities owning and maintaining public wharves, landings, and docks for hire are required to maintain them in safe condition for use. 28 Cyc. 1309, and cases cited. And there can be no serious question but that it would be liable, for damages sustained for a failure to exercise reasonable care in this respect, to the same extent as though the bridge was owned and operated by an individual. City v. Hudson, 94 Ga. 135, 21 S. E. 289; 1 Thompson, Negligence, 813.

The case of Becker v. City, 99 Wis. 414, 75 N. W. 84, 40 L.R.A. 829, 67 Am. St. 874, involving liability for neglect in the maintenance of a similar bridge at La Crosse, is not an authority to the contrary. The defect involved in that case was an improper construction of the approaches to the bridge, extending a distance of two miles over and across the river bottom on the Minnesota side of the stream. The Wisconsin court held that, while the bridge was constructed under proper authority, the city of La Crosse had no power to extend its jurisdiction into Minnesota and make itself responsible for the highway over the bottom land adjacent to the river in that state. The act of the legislature of Minnesota granting authority to the city of La Crosse to construct and maintain that bridge provided that the city should be responsible for accidents and injuries resulting from its failure to maintain the structure in proper condition for use. Had the accident there complained of been caused by a defect in the bridge itself, though happening upon the Minnesota side of the river, the Wisconsin court would undoubtedly have held the city liable. In other words, the court would have held that, in accepting the grant from this state, it also as a matter of law accepted and assumed the conditions attached to it.

And again, though the bridge be treated as the private property of the city, it is in all essential respects a public thoroughfare, and

the liability respecting its control and management must be measured and determined according to the principles of law applicable to the care and maintenance of public streets and other public grounds. The bridge answered every purpose of a public way. It was constructed to enable the public to pass to and from the state of Wisconsin, and in no essential respect differs from a public bridge along and upon a highway wholly within the boundaries of the city. It is well settled that, when a municipality authorizes a third person to place upon its public streets agencies of a character likely to endanger the traveling public, even though the privilege granted be beyond its authority, liability arises upon injury to a person lawfully upon the street who is free from fault. City of Winona v. Botzet (C. C. A.) 169 Fed. 321; Stanley v. City, 54 Iowa, 463, 2 N. W. 1064, 6 N. W. 706, 37 Am. Rep. 216; City v. Smith, 101 Va. 161, 43 S. E. 345; Landau v. New York City, 180 N. Y. 48, 105 Am. St. 709, and cases cited in note; 28 Cyc. 1354. The liability in this respect is limited by some of the courts to those cases where the municipality retains control over the time, place, and manner in which the agency is placed in the streets. It is founded on entirely different principles from cases involving negligent maintenance of property to which the public have no right to resort for business or other purposes, where no duty or obligation to exercise care for their protection is imposed by law.

We shall not attempt to mark the line between governmental and municipal functions. The former concern the administration of the law by an agency of the state government; the latter, the internal affairs of the municipality. And whether the bridge and its maintenance be construed as a private enterprise entered upon by special legislative authority, or as a quasi public highway, it is clear that the governmental functions of the city are in no way involved therein, and that the control of the bridge springs from its municipal or proprietary powers. From which it logically follows that the right granted the power company to string its wires thereon was not an exercise of governmental functions. Snider v. City of St. Paul, 51 Minn. 466, 472, 53 N. W. 763, 18 L.R.A. 151.

2. The contention that Hoppe, to whom the city let the contract

to paint the bridge, was an independent contractor, does not seem to be involved in the action. The thing causing the death of decedent was not the result of any act or omission on the part of the contractor, but the joint act of the power company in stringing the wires upon the bridge and that of the city in permitting it. Had the contractor's negligence been the cause of the death of decedent, then the liability of the city could well be questioned. But such was not the case. The evidence is clear that the contractor failed in no duty to warn decedent of the likelihood of danger of a brush discharge of electricity from the wires, for he was in total ignorance of that fact. The danger from this source, though present, was concealed and beyond the knowledge of the contractor or his servants, and the duty of making it known was upon the city. Smith v. Twin City Rapid Transit Co., 102 Minn. 4, 112 N. W. 1001; Hagen v. Schleuter, 236 Ill. 467, 86 N. E. 112, 22 L.R.A.(N.S.) 856. The question whether defendant city was negligent in this respect was properly submitted to the jury. It is probable that as to all dangers incident to the presence of the wires, known and understood by the contractor, the city could not be held responsible. In such case the contractor would perhaps alone be liable for injury to his servants. Engel v. Eureka, 137 N. Y. 100, 104, 32 N. E. 1052, 33 Am. St. 692.

This covers all questions requiring special mention. The issues of fact involved in the action were properly sent to the jury, and the record presents no reversible errors.

Order affirmed as to both defendants.

JAGGARD and SIMPSON, JJ., took no part.